UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | | |
| | : | | CRIMINAL |
| v. | : | | NO. 3:05CR168 (MRK) |
| | : | | |
| LEONARD REDICK | : | | |
| | : | | |
| | : | | |

**MEMORANDUM OF DECISION**

Defendant Leonard Redick, a convicted felon, is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Mr. Redick has moved to suppress a 9mm semi-automatic handgun, $400 in cash, and twenty-seven containers of marijuana that police seized after stopping Mr. Redick's vehicle on the basis of a tip from a confidential informant. *See* Memorandum in Support of Motion to Suppress [doc. #22]. Mr. Redick also appears to request that the Court suppress his admission that he was carrying a firearm, made to police as they approached his vehicle. *See id*.

At Mr. Redick's request the Court held an evidentiary hearing on his motion to suppress. Two of the detectives present at the time of Mr. Redick's arrest testified, as did Mr. Redick's girlfriend, Ms. Sophia Hastings, who owns the car that Mr. Redick was operating at the time of his arrest, and Mr. Redick's mother. *See* Witness List [doc. #37]. The Court also received into evidence several documents, including photographs and an affidavit Mr. Redick had submitted in support of his motion to suppress. *See* Exhibit List [doc. #36]; Redick Affidavit, attached to Motion for Evidentiary Hearing [doc. #24]. After careful consideration of the parties' arguments, the Court DENIES Mr. Redick's Motion to Suppress [doc. # 21].

**I.**

Based on the parties' memoranda and the testimony provided at the evidentiary hearing, the Court finds the facts relevant to the Motion to Suppress as follows. At around 2 p.m. on March 23, 2005, Detective Brenden Plourde received a cell phone call from a known confidential informant, whose tips had previously led to around a dozen arrests, to the effect that a black male known as "Cheddar" had a silver, automatic handgun in his waistband pocket and was selling drugs in the parking lot adjoining a retail store known as the Wreck Shop. The informant then told Detective Plourde that Cheddar was leaving the parking lot in a clean, silver, four-door car with dark tinted windows, shaped like a Nissan Altima and bearing Connecticut plates with the sequence "855 ?FW" or "855 ?WF." Police proceeded to the scene but could not locate any such vehicle in the vicinity of the Wreck Shop. However, in a  further conversation, the informant told Detective Plourde that Cheddar would return to the Wreck Shop parking lot sooner or later, because he often used it for his drug sales. The officers therefore decided to wait in the parking lot in an unmarked car and see if Cheddar would return to the lot later that day.

At around 2:40 p.m., the officers observed a clean, silver, four-door Toyota Avalon with dark tinted windows and registration "855 RFW" pull into the parking lot of the strip mall in which the Wreck Shop is located. Although the vehicle matched the informant's description, including tag number, officers were unable to ascertain the number or description of the vehicle's occupants due to the dark tinted windows. Police then employed three police cars to immobilize the suspect vehicle and prevent the allegedly armed driver from escaping with his firearm. Detective Felix Ortiz blocked the car from behind, Detective Robert Burgos blocked it from the front, and Detective Plourde's unmarked car pulled up on the driver's side. Detectives Plourde, Burgos and Ortiz then exited their

2

vehicles with their badges displayed and their guns drawn and leveled on the suspect car. As the officers approached to the vehicle, Detective Plourde was able to see a black man sitting in the driver's seat, talking on a cell phone, but was unable to make out the rest of the interior of the car due to the tinting of the windows. As the police drew close to the car, the occupant dropped his cell phone and raised his hands. Detective Ortiz then opened the driver's door, and the officers heard the driver shouting that he had a gun in his waistband and not to shoot. Detective Burgos opened the passenger door, leaned in, turned off the engine, and secured the driver's hands away from the weapon in his waistband by drawing them up and over his head to the side. Once his hands had been secured in this manner, Detective Ortiz reached in from the driver's side and removed the gun, a silver semi-automatic Smith & Wesson handgun matching the informant's description. After securing the firearm, and removing from it a hollow point round of ammunition, the officers removed the driver from the car and ordered him to lie on the ground, where he was handcuffed. Once the driver had been immobilized in this fashion, Detective Plourde returned to the car to search for additional weapons and saw a plastic bag on the passenger seat. Upon opening the bag, which was not secured but was sufficiently closed at the top that he could not see inside, Detective Plourde discovered 27 small plastic boxes of marijuana. In addition, the police discovered $400 in cash in the driver's pocket.

## II.

As a preliminary matter, the Court notes that, once it was revealed that Mr. Redick had been concealing a firearm in his waistband, police officers had probable cause to arrest him on suspicion of illegally possessing the weapon. *See Adams v. Williams*, 407 U.S. 143, 148 (1972) (holding, in the context of a *Terry* stop, that "[o]nce [the police officer] had found the gun precisely where the

informant had predicted, probable cause existed to arrest [defendant driver] for unlawful possession of the weapon"); *see also State v. Williams*, 59 Conn. App. 771 (2000) ("'In determining whether the police officers had probable cause to arrest the defendant for carrying a weapon in a motor vehicle, we also note that probable cause may exist even without ascertaining whether the defendant had a permit to carry the weapon discovered.'" (quoting *State v. Lizotte*, 11 Conn. App. 11, 19 (1987) *cert. denied*, 204 Conn. 806 (1987)) (reversed on other grounds by *State v. Williams*, 258 Conn. 1 (2001))).  Discovery of the weapon in Mr. Redick's waistband – precisely the kind of handgun the informant said he would have and precisely where the informant said it would be – also tended to confirm the informant's information about Mr. Redick's drug dealing.  *See United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003) (firearms are common "tools of the trade" for drug traffickers); *United States v. Salazar*, 945 F.2d 47, 51 (2d Cir. 1991) (it is well known that "narcotics dealers frequently carry weapons").

Further, once Mr. Redick had been found armed and placed under arrest on that basis, officers were authorized to search the passenger compartment of his vehicle for further weapons, even though Mr. Redick had been handcuffed and placed on the ground, from which position it would be difficult for him to access any remaining firearms in the vehicle.  *See Thornton v. United States*, 541 U.S. 615, 617-18 (2004)  ("when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile," even where the driver of the vehicle has been "handcuffed, informed . . . that he was under arrest, and placed . . . in the back seat of the patrol car.").

Mr. Redick does not take issue with the foregoing propositions. Rather, Mr. Redick's

4

suppression motion turns on whether the police violated his Fourth Amendment rights by converging on his car with their weapons drawn based on the tip of a confidential informant rather than personal observation by police of suspicious activity in or around the vehicle. If, as Mr. Redick maintains, the seizure of his vehicle in this manner was unlawful, the discovery of the handgun on his person and the drugs in the car that flow from the initial stop are tainted by its illegality and must be suppressed. Mr. Redick advances two arguments for the proposition that his car was stopped unlawfully, each of which is addressed, and rejected, below.

A.    Was there reasonable suspicion for a *Terry* stop?

Warrantless searches are *per se* unreasonable under the Fourth Amendment unless they fall within one of several recognized exceptions to the warrant requirement. *See Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993); *United States v. Casado*, 303 F.3d 440, 443 (2d Cir. 2002). "One such exception was recognized in *Terry v. Ohio*, 392 U.S. 1 (1968), which held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . ' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at conforming or dispelling his suspicions." *Dickerson*, 508 U.S. at 372-73 (quoting *Terry*, 392 U.S. at 30).  Such a warrantless "*Terry* stop" is permitted where the officer can articulate "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  In evaluating the officer's justification, the relevant question is: "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22 (internal quotation marks omitted); *United States v. Thomas*, 363 F. Supp. 2d 84, 91 (D. Conn. 2005).

5

Mr. Redick's first argument is that police lacked the requisite reasonable suspicion to justify the officers' stopping Mr. Redick and breaching the privacy of his car under *Terry* and its progeny. Based upon the hearing testimony of Detective Plourde, an experienced officer whose testimony the Court found consistent and credible, the Court disagrees with Mr. Redick and finds that the standards for a *Terry* stop were satisfied in this case.

Here, Detective Plourde received a tip that an individual known by the street name of "Cheddar" was armed with a gun in his waistband and dealing drugs from a car in parking lot associated with the Wreck Shop. "[A] tip from [a] known, reliable informant that [is] immediately verifiable at the scene [can] form [the] basis for reasonable suspicion and [a] forcible *Terry* stop." *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (citing *Adams v. Williams*, 407 U.S. 143, 146-47 (1972) (internal quotation marks omitted)). The facts of this case indicate that the tip provided to Detective Plourde had numerous indicia of reliability that justified police in acting upon it. First, the tipster was known to Detective Plourde and had in the past provided the Detective with reliable information leading to around a dozen arrests, the informant had been expressly warned by police that if he ever knowingly provided false information, he could face arrest and, in Detective Plourde's experience, the informant had never provided false information. Second, the Wreck Shop was known to Hartford police as a base for a large-scale drug supplier, and the informant had drawn Detective Plourde's attention to the drug-related activities of Cheddar on previous occasions. Third, the tip from the informant was provided contemporaneous with the events the informant was observing: the informant called Detective Plourde on a cell phone while the informant was observing Cheddar at the Wreck Shop location doing drug deals and putting the firearm in his waistband.  The informant then followed Cheddar out of the parking lot while still on the cell phone with Detective

6

Plourde.  Fourth, the informant was able to provide a reasonably detailed description of the car from which he alleged that Cheddar was operating, including color, condition and body-style and, at Detective Plourde's request, the informant was able to relay a five digit sequence from the license plate. Fifth, the informant told Detective Plourde that he had actually seen the gun that Cheddar was carrying and the informant described it as a silver automatic that was tucked into Cheddar's waistband.

It is true that not all of these details are contained in Detective Plourde's police report. However, Detective Plourde credibly testified that he omitted certain details about exactly what the informant had told him from the police report because they were details that could only have been known to one of the people in the parking lot with Cheddar, and disclosure of the details would therefore have allowed Cheddar and any associates to divine the informant's identity. Since the informant was still working for police, Detective Plourde did not want to compromise his identity.

It is also true that when Detective Plourde arrived at the Wreck Shop location, no car matching the informant's description was found, that Detective Plourde had only the most cursory physical description of Cheddar (a stocky black male) to go on, and that when the suspect vehicle returned to the lot, its tinted windows prevented Detective Plourde from verifying whether the driver matched even that minimal description prior to advancing upon the car. However, a car matching the informant's description, including tag number, did appear in the Wreck Shop lot just forty minutes after the tip was provided. Moreover, while Detective Plourde was watching the suspect car, the informant called him on his cell phone and informed Detective Plourde that Cheddar had returned to the Wreck Shop lot.  When Detective Plourde told the informant that he was already at the lot, the informant stated that he saw both Detective Plourde and Cheddar and that the car

Detective Plourde was watching was, in fact, the car that Cheddar was driving.[1]  Thus, in this case, there was a positive identification on the scene by a known, reliable informant who had actually seen Cheddar engage in narcotics activity. In these circumstances, the Court concludes that police had reasonable suspicion (under the above-cited precedents of *Adams* and *Vargas*) for conducting a *Terry* stop of Mr. Redick's vehicle.  *See also*, *Alabama v. White*, 496 U.S. 325, 330 (1990) (an "unverified tip from [a] known informant might not have been reliable enough to establish probable cause, but [we have] nevertheless found it sufficiently reliable to justify a *Terry* stop." (citing *Adams*, 407 U.S. at 147)).

B.      Did the *Terry* stop ripen into a *de facto* arrest?

Anticipating the Court's conclusion that the informant's tip provided reasonable suspicion for a *Terry* stop, Mr. Redick has argued in the alternative that the manner in which the stop was executed transformed it into a *de facto* arrest, for which probable cause, rather than mere reasonable suspicion, was required. Mr. Redick asserts that, prior to opening the door to his car and finding the gun in his possession, police had no probable cause to arrest him and that the incriminating evidence discovered as a result of the *de facto* arrest must therefore be suppressed. As explained below, the Court is not persuaded.

Mr. Redick is correct that while a *Terry* stop requires only reasonable suspicion of criminal activity, a *de facto* arrest requires probable cause to believe that a crime has been or is being committed. *See Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991). A *de facto* arrest occurs when "the totality of circumstances indicates that an encounter has become too intrusive to be classified as an

---

[1] Once again, Detective Plourde credibly accounted for the absence of this information from the police report in terms of the need to protect the informant's identity.

investigative detention." *Id.* "Whether a seizure is an arrest or a merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." *Id.* To prevent a *Terry* stop from crossing the line into a *de facto* arrest, officers "must employ 'the least intrusive means reasonably available' to effect their legitimate investigative purposes." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). "Among the facts generally deemed relevant are (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons." *Newton*, 369 F.3d at 674; *see also United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993).

In this case, after confirming with the informant that the car which they were observing was the car containing Cheddar, the officers employed three police cars to immobilize the suspect vehicle and prevent the allegedly armed driver from escaping with his firearm. Three officers then exited their vehicles with their badges displayed and their guns drawn and leveled on the suspect car.  As they approached, Detective Plourde found himself at an angle from which it was possible to see through the tinted windscreen well enough to discern that a man fitting the informant's brief description was occupying the driver's seat and talking on a cell phone. Soon thereafter, the driver noticed the officers and rapidly raised his hands in the air, discarding his phone. As the officers converged on the car, Detective Ortiz opened the driver's side door, and the officers were able to hear the driver shouting words to the effect of "Don't shoot me, I have a gun." At the time that Mr. Redick announced his possession of a firearm, no officer had yet spoken to him. Hearing that the driver was armed, Detective Burgos opened the passenger side door, turned off the ignition, and grasped Mr.

9

Redick's raised hands, pulling them to the side, so that Detective Ortiz could safely reach in from the driver's side and remove the gun from Mr. Redick's waistband.

Mr. Redick contends that this sequence of events constituted a *de facto* arrest. The Court disagrees. "[A]lthough '[u]nder ordinary circumstances, drawing weapons and using handcuffs are not part of a Terry stop[,] intrusive and aggressive police conduct' is not an arrest 'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.' " *Vargas*, 369 F.3d at 102 (quoting *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) (second and third alterations in original); *see also United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) ("a law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists."). Thus, the Second Circuit has observed that "[t]he fact that agents have used their cars to block a vehicle does not necessarily mean that, instead of a *Terry* stop, there was a *de facto* arrest." *Perea*, 986 F.2d at 644.  "Nor does the fact that the officers approached a stopped car with guns drawn in order to protect themselves and bystanders on the street necessarily transmute a *Terry* stop into an arrest."  *Id.*  In *Vargas*, for example, the Second Circuit held that police did not arrest the defendant until after a pat down revealed a firearm, even though four officers chased him, struggled with him, placed him on the ground and handcuffed him, prior to the pat-down. The Second Circuit noted that the officers had a tip from a reliable informant that Vargas was armed, that Vargas had shown his unwillingness to cooperate by running away, and that "the detention of Vargas, prior to discovery of the firearm, was very brief." [2]

---

[2] In arguing that the *Terry* stop in this case was transformed into a *de facto* arrest, Mr. Redick relies heavily upon the Second Circuit's decision in *United States v. Marin*, 669 F.2d 73, 81 (2d Cir. 1982), which also involved law enforcement agents blocking the defendant's car and agents

Here, police had reliable first-hand information from a known informant that Mr. Redick had a handgun in his waistband, had been displaying it to other individuals in the parking lot, and was dealing drugs, facts which sensibly heightened the officers' concern for their own safety and that of the public, since this was a commercial parking lot in which other cars were parked. Furthermore, although Mr. Redick was immediately cooperative, the tinted windows of his vehicle made it impossible for police to assess his level of aggression or whether the car contained any additional sources of danger until they had already converged on the car and opened the driver's side door. *See United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1997) (having to approach a vehicle with tinted windows during "already dangerous" traffic stops "increases exponentially" the "potential harm to which the officers are exposed"). Police did block in Mr. Redick's car, advance on it with their weapons drawn, and open the door without his permission. They did not, however, handcuff him or force him to the ground until after the discovery of the firearm. Under the particular circumstances of their encounter with Mr. Redick, the officers acted reasonably in immobilizing his vehicle and approaching it with their weapons drawn and, as in *Vargas*, the *Terry* stop was not transformed into an arrest until after police seized the gun from Mr. Redick's waistband.

---

surrounding the car with guns drawn. It is true that in *Marin*, the Second Circuit found that the initial stop of the car "was sufficiently forceful and intrusive that it was tantamount to an arrest." *Id.* at 82. However, as the Second Circuit has emphasized in more recent decisions, whether a *Terry* stop has been transformed into a *de facto* arrest is necessarily a contextual inquiry that "depends on the facts surrounding [the] encounter [with the police], and must be assessed in light of those facts." *Doherty*, 944 F.2d at 98; *see also Perea*, 986 F.2d at 646 (emphasizing the centrality of the "factual issues" to the determination of lawfulness). In particular, the Second Circuit has noted that "this Court and other circuits have found an intrusive detention to be only a *Terry* stop [when] the police . . . had a reasonable basis to believe the suspect was armed or otherwise dangerous," *Oliveira v. Mayer*, 23 F.3d 642, 646 (2d Cir. 1994) (collecting cases), precisely the situation in the current case. Suffice it to say that having considered the facts of this case, as well as the Second Circuit's decisions in *Vargas*, *Alexander*, *Oliviera*, *Perea* and *Marin*, the Court does not believe that the *Terry* stop in this case was transformed into an arrest until after police seized the gun from Mr. Redick.

11

Accordingly, the Court DENIES Mr. Redick's Motion to Suppress [doc. # 21].


IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: <u>April 5, 2006</u>**.

12